## Stresenreuter Brothers, Appellee, v. Edwin J. Bowes, Jr., and Frederick M. Bowes, Appellants.

## Gen. No. 28,228.

1. BUILDING CONTRACTS—*modification of clause for certificate.* In an action by a contractor on a building contract, held that the article of the printed contract which provided that architect's certificates be required as a condition precedent to payment was entirely superseded by a typewritten article bearing the same number and pasted over it and that under such new article no architect's certificates were required as a condition precedent to payment.

2. CONTRACTS—*surplusage allegations on refusal to arbitrate.* Where there was nothing in a building contract on the subject of arbitration that would be binding between the parties, allegations in a special count as to the refusal of defendant to arbitrate were mere surplusage and need not be proven.

3. CONTRACTS—*pleading legal effect of contract set out verbatim is surplusage.* When a plaintiff sets up *in hæc verba* in the declaration the written contract involved, it becomes the duty of the court to determine its legal effect and averments in plaintiff's pleadings as to their legal effect are superfluous and, therefore, not binding.

4. BUILDING CONTRACTS—*validity of contract where plans and specifications not yet made.* A contract for the erection of a building was binding on the parties though the plans and specifications were not in existence when it was signed but shortly thereafter excavation plans were furnished and work begun and various other plans were furnished as the work progressed.

5. ELECTION AND WAIVER—*acquiescence as waiver.* As matter of

law, acquiescence with knowledge of the facts may imply assent and give rise to an obligation or constitute a waiver of a right.

6. BUILDING CONTRACTS—*waiver of limit price in cost-plus agreement*. In an action on a cost-plus building contract, held, that under the law and the evidence, the jury were entitled to find that, although the contract originally contained the maximum cost price of $183,000, subsequently, as a result of the conduct of the parties, that figure was waived.

7. INSTRUCTIONS—*as whole, when consistent with pleadings*. An alleged inconsistency between the pleadings of plaintiff and certain instructions is unimportant where the instructions as a whole, taken collectively, were entirely proper, considering the pleadings and the evidence offered at the trial.

8. ESTOPPEL—*effect of recitals in receipts as to cost*. In an action on a cost-plus building contract where the binding effect of a maximum cost stated in the contract was in dispute, receipts given by plaintiff from time to time reciting "Contract price-cost plus 10%, not to exceed $183,000.00," were merely formal papers given for money admittedly due and, while they were some evidence, they did not constitute an estoppel.

9. BUILDING CONTRACTS—*sufficiency of proof of modification by changing plans*. In an action on a cost-plus building contract containing a limitation as to the total cost, defendant's contention that the plans and specifications which were made as the work progressed and were changed in some important particulars were accepted by plaintiff as being in accordance with the contract and that plaintiff's attitude led defendant to believe they were so accepted, held not supported by the evidence which, on the contrary, showed that all the parties knew the plans and specifications were being changed from time to time in a manner inconsistent with the original contract.

10. BUILDINGS—*consistency of extra work claim with cost limit*. A claim for extras made by a building contractor was not inconsistent with his contention that the maximum cost stated in the original cost-plus contract had been waived.

11. CONTRACTS—*allegations implying waiver of cost-plus limitation*. A bill of complaint, which became a bill of particulars when the cause was transferred to the law side of the court in a suit by a contractor on a cost-plus building contract, which was drawn on the theory that, by delay in furnishing plans and specifications and because of the extent to which the building erected differed from the contract-building and another building which it was supposed to be patterned after, plaintiff was entitled to recover the total cost of the building plus 10 per cent regardless of a cost maximum stated in the original contract, necessarily implied a waiver though not mentioning it expressly.

12. CONTRACTS—*instructions on extra work over agreed cost limit.* In an action on a cost-plus building contract an instruction given for defendant that the jury might add to the maximum cost fixed by the contract the established cost of any changes and additions directed by defendants and a similar instruction given for plaintiff, held, sufficiently consistent with the pleadings and the evidence.

13. EVIDENCE—*foundation for admission of pay sheets in evidence.* In an action on a cost-plus building contract, held, that under the facts of the case and in the absence of contradictory testimony, the time and pay sheets were properly and accurately kept, so as to be admissible in evidence.

14. CONTRACTS—*sufficiency of proof of use of invoiced materials in building.* In an action on a cost-plus building contract, held, that it was sufficiently shown that materials charged for were not only delivered to but were used in the building and that the bills and invoices therefor were properly admitted in evidence.

15. CONTRACTS—*foundation for invoices as evidence of materials used in building.* In an action on a cost-plus building contract, where plaintiff's bookkeeper testified as to the invoices that the amounts shown therein were the amounts actually paid to the materialmen and there was no testimony to the contrary it was not necessary that there be express testimony that the prices were "true and correct."

16. CONTRACTS—*propriety of charge on delay caused by other party's default.* Where there was considerable evidence tending to show that the work on a building was delayed by failure of defendants to furnish plans and by their ordering radical changes in the construction of the building, it was proper for the judge to instruct the jury that if they should find that plaintiff did not substantially complete the building within the time fixed by the contract defendants would be entitled to damages at the rate of $50 a day over the contract time unless the jury believed from the evidence that such delay or some part of it was occasioned by the act, omission or neglect of defendants or that they waived such provision of the contract.

17. BUILDING CONTRACTS—*delay caused by owner.* If delay in the construction of a building is caused by the conduct of the owner he is not entitled to place the blame on the builder though there is a provision in the contract that the work shall be completed by a certain date.

18. BUILDING CONTRACTS—*basis for computing commission on cost-plus contract.* Under the provisions of a building contract that "contractor shall furnish all labor and material necessary to perform his work under this contract at cost plus 10%" the contractor was entitled to 10% on the amounts charged by subcontractors, he

not being limited to 10% on the cost of the material and labor to the subcontractors.

19. SAVING QUESTIONS FOR REVIEW—*failure to make objection.* If an objection is of such a character that it might have been removed by further evidence, and is not made and insisted upon in the trial of the case, it will not be considered on appeal.

20. CONTRACTS—*presumption as to compliance of building with building ordinances.* In an action on a building contract where the architect testified that plaintiff had secured a permit for the building and that he, the architect, furnished a set of plans that were taken to the City Hall and marked approved by the city, and there was no evidence that the building as finally constructed was not in accordance with the city ordinances, it is fair to assume that the building was constructed as provided for in the contract as far as requirements of the city ordinances are concerned.

21. BUILDING CONTRACTS—*excessiveness of award under cost-plus contract.* Where a compilation made by counsel for defendant in an action on a cost-plus building contract made no allowance for the 10% of cost and with that added amounted to $48,776.54, while the compilation by plaintiff's bookkeeper of the sum due plaintiff was $48,282.31, a verdict for plaintiff of $35,000 was not excessive.

22. HARMLESS ERRORS—*improper hypothetical question where facts fully appeared.* That a hypothetical question, put to contractors on behalf of plaintiff, in an action on a cost-plus building contract where changes in specifications and plans had been made increasing the cost after the contract was made, which required an answer as to whether the difference in cost between the building first contemplated and the one completed could be determined with reasonable certainty, was not in good form and could not be easily understood was unimportant where plaintiff put in evidence undertaking to show the total cost so that the difficulty of computing such difference was immaterial.

23. EVIDENCE—*sufficiency of hypothetical question.* It is only necessary that hypothetical questions, considering the particular issue, shall contain such a collection of the facts as the questioner assumes the evidence tends to prove and the trial judge in his discretion may consider pertinent and, if answered, probably helpful.

24. EVIDENCE—*sufficiency of hypothetical question.* The rules of evidence are not finical as to the form of hypothetical questions, it being sufficient if the question is, in substance, propounded as a hypothesis.

25. INSTRUCTIONS—*requests refused because already covered.* Various instructions, in an action on a cost-plus building contract, requested by defendant, held, properly refused on the ground that they were practically covered by instructions given in so far as they were proper and justified by the evidence.

26. INSTRUCTIONS—*refusal of request which ignored material questions.* A request, in an action on a cost-plus building contract, to instruct that if changes were made in the plans and specifications and the parties were silent as to cost there could be no recovery beyond the maximum fixed in the contract, was properly refused as there might be a waiver of one or more terms of a contract without an agreement to that effect in express words.

Appeal by defendants from the Superior Court of Cook county; the Hon. EDWARD D. SHURTLEFF, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1922. Affirmed. Opinion filed June 4, 1924. *Certiorari* denied by Supreme Court (making opinion final).

SONNENSCHEIN, BERKSON, LAUTMANN & LEVINSON, for appellants.

HOLDOM, PRATT & ZEISS, for appellee; C. W. GREENFIELD, of counsel.

MR. PRESIDING JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal from a judgment for $35,000.00, in the superior court, based upon a verdict in favor of the plaintiff, Stresenreuter Bros., building contractors, against the defendants, Edwin J. Bowes, Jr. and Frederick M. Bowes, for a balance claimed to be due for the erection of a seven-story and basement building on a cost-plus contract. It is the theory of the plaintiff that the building was erected by it on a cost plus ten per cent basis; that, although the contract contained a maximum cost provision of $183,-000.00, the cost provision was based on another building known as the St. Clair building, and was waived in the course of carrying out the contract; that it was practically admitted that the plaintiff paid out for labor and material in the erection of the building (including $18,000.00 which the plaintiff loaned the defendants to remove an incumbrance on the lots) the sum of $202,912.00; that the amount, on which ten per cent for the plaintiff should be figured, was shown to

be $182,219.74, making ten per cent the sum of
$18,221.97; that the interest on the $18,000.00 loan
was $2,642.00; that the defendant paid a total of
$175,000.00, leaving due the difference between $223,-
776.00 (which is made up of $202,912.00, $18,221.97,
and $2,642.00) and $175,000.00, which is $48,776.00.

The theory of the defendants is that the plaintiff
was bound by the maximum amount mentioned in the
contract, i. e., $183,000.00; that they are entitled to a
set-off or recoupment for defective performance and
for delay in completion of the work, and that certain
errors were committed by the court in the trial of the
case.

The suit was originally begun by the plaintiff filing
a bill of complaint in the superior court. Subse-
quently, on motion of the plaintiff, the cause was
transferred from the chancery to the law side of the
court, to proceed as though originally commenced as
an action in assumpsit. A declaration, containing
the common counts, was filed, and an affidavit, setting
up an account sued on, in the sum of $73,837.48 for
work, labor and materials furnished and money ad-
vanced to the defendants was made. An order was
entered that the bill of complaint stand as a bill of
particulars. The defendants filed a plea of the gen-
eral issue, and a plea of set-off. By the latter, they
claimed $25,000.00 for a loss of rents resulting from
delay in completion of the building, and $60,000.00 for
changes and repairs caused by defective work. The
plaintiff was given leave to increase the *ad damnum*
to $100,000.00 and to file an additional count to its
declaration. An additional count was filed, also, a
replication to the defendants' plea of set-off. It was
ordered that the defendants' pleas already on file
stand as pleas to the declaration, and that the defend-
ants' affidavit of merits stand to the amended count
of the declaration. On January 10, 1921, the defend-
ants filed a plea denying the execution of the writing
of October 28, 1916, set out in plaintiff's amended

count. There was a trial by jury and on April 1, 1922, a verdict in favor of the plaintiff in the sum of $35,000.00, on which judgment was subsequently entered.

The evidence shows that two written agreements, each dated October 28, 1916, the first signed on that date, and the other, two or three days later, were made between the parties. The first contained the following: "in consideration of awarding the contract for the construction of a certain seven story and basement mill bldg. by said owners to Stresenreuter Bros., that said contractors hereby agree to advance Eighteen Thousand dollars for the purpose of paying off a certain incumbrance on the above property, this amount of money is to be made part of the cost of the bldg. viz.: $183,000, and to be paid back to the contractors on vouchers certified to by the architect as the work progresses, in the same manner as other payments are made from time to time, or if possible to be added to the first voucher as part payment under the contract for said bldg."

The second written agreement, entitled, "Articles of Agreement," is a filled out printed form. It consists of two pages of printed matter, with various blanks filled in, and two typewritten sheets, one attached under Article I, and one attached as, and entitled, "Article III." The "General Conditions of the contract" follow the signatures to the Articles of Agreement, and are made up of 45 paragraphs. Article I of the Articles of Agreement recites—in a typewritten insert—the elements of the work to be done and the material to be furnished. It contains, also, the following: "All of above mentioned items are intended to cover the work complete for a seven (7) story and basement standard mill constructed building in accordance with City ordinances covering same and to have a live load carrying capacity of not less than 200# per. sq. ft. on each and every floor." It, also, recites that the first floor should be level with

the sidewalk; the building 90 feet in height above the sidewalk, in accordance with the City ordinances; the basement to be not less than 9 feet in the clear; and "All in accordance with plans and specifications to be prepared by Samuel N. Crowen, Architect and to be erected by said owners based upon a similar building erected by said Owners * * * and known as the St. Clair Building, with the following exceptions and modifications, viz., area of new building is to be approximately 13,500 sq. ft. and the first floor is to be level with the sidewalk and the exterior is to be more ornamental that is, to have more terra cotta trimmings and to be of such design as will be suitable for a high class mercantile building with maximum amount of glass area. Interior to be similar to St. Clair Building and to have provision made for an additional passenger elevator." It also recites that the building is to be erected on the southwest corner of the Lake Shore Drive and Ohio Street; that the lot is 158 feet 2½ inches on Ohio Street by 109 feet on the Drive; that there is a building restriction of 20 feet on the Drive; and that the building is to cover approximately 126 by 109 feet.

It is provided by Article II that the contractor shall complete the work on or before April 1, 1916, otherwise pay $50.00 for each day the work remains uncompleted. Article III, as it is printed, seems to be entirely replaced by a typewritten sheet which is pasted on. The typewritten Article III is as follows:

"Contractor shall furnish all labor and material necessary to perform all work under this contract at cost plus 10%. The established cost will include all labor and material purchased, plus a profit of 10%, and the cost of scaffold lumber, freight and drayage, liability insurance, workmen's compensation insurance, and contractor's Employer Ass'n fees, which items are to be added after the cost of labor and material plus a profit of 10% has been arrived at. It is understood that the contractor shall furnish his own overhead, such as bookkeeping and accounting and

office management, machinery and tools. The archi-
tect's superintendent will keep the time and will check
all material bills on this work. Payments to be made
as follows: 85% of the total cost (of labor and ma-
terial, plus a profit of 10% including the cost of such
items as above enumerated), as the work progresses,
the balance or 15% of the total cost of the work to
be paid thirty days after work is entirely completed.
In consideration of the above the contractor guaran-
tees hereby that the outside limit cost of the building,
including all items as hereinbefore mentioned and
called for under his contract, shall not exceed the sum
of $183,000, modified only by architect's written or-
ders, which may be issued for any deductions or addi-
tions in accordance with the provisions of section (23)
'General Conditions' of the contract. It is further
agreed that all material purchased for this work shall
be by and with the consent of the owners and through
their architect, acting as the owners' agent, and trip-
licate bills furnished, one each for owner, architect
and contractor.''

At the time the two written agreements, dated Oc-
tober 28, 1916, were executed, there were no plans
and specifications of the building in question in ex-
istence, and, according to the testimony of F. M. Stres-
enreuter, immediately after the two agreements were
signed, he and the defendants and the architect began
to have conferences in the architect's office as to the
plans and what would be necessary to construct the
building, and ''to get the plans and different things
ready as to what was to be done.'' On or about No-
vember 7, 1916, about ten days after the contract
was signed, the architect, Crowen, for the defendant,
delivered to the plaintiff a blueprint pertaining to ex-
cavation, and a few days afterward the work of exca-
vation was begun. At that time the plan of excavation
did not extend throughout the whole front of the lot
on Ohio street, but left an alleyway at the west end,
of 17 feet and 7 inches, apparently to be used as a
driveway, and over which the building was not to

extend. Subsequently another excavation plan, dated November 21, and entitled "Excavation Plan Revised" was furnished, which provided for the excavation of a certain part of the lot up to the extreme west line. The first plan indicated that it was the intention not to extend the building over the west 17 feet and 7 inches of the lot, nor to excavate a certain prescribed area at the southwest corner, but the "Excavation Plan Revised" provided for the excavation of an intermediate part of the 17 feet and 7 inches on the west side, and suggested, for the first time, the carrying of the west wall of the building to the west line of the lot, making a radical change in the situation as set forth in the first excavation plan, and, as a consequence, in the originally contemplated size of the building.

The evidence of F. M. Stresenreuter was that he told the defendants "early in the proceedings, that they were making radical changes from the St. Clair Building, and that the figures on their building would far exceed the cost the contract called for," and "they must expect the additional cost to go with it." From time to time, as the work went on, further plans concerning different elements in the construction of the building were given by the defendants to the plaintiff, making in all twenty-four sets of plans, the first of which was dated November 7, 1916; the last as late as April, 1917.

The final permit from the City of Chicago for the construction of the building was issued, according to the architect, on January 4, 1917. There had been some controversy with the city in regard to the location and number of the piles, and as a result, the plans were changed and others substituted, and an agreement reached with the city, and the permit issued. On January 25, 1917, the foundations were practically completed.

Showing the condition of the work on January 25, 1917, a memorandum which was issued by one of the

employees of the architect was offered in evidence and is as follows:

"January 25, 1916. (sic, evidently meaning 1917) Bowes building. 70 men work today including 8 carpenters. Reinforcing steel placed for retaining wall on Lake Shore Drive and form work for west wall 80 per cent completed. Had Stresenreuter get canvas today so as to protect concrete in walls and piers. Salamanders will be used in connection with this so there should be no danger of exposing concrete to frost. The pile driver is having difficulty in getting out of the excavation but expects he can do this in the next two days. Twenty men worked last night digging and working the pumps. This crew will be kept working until all work in basement is completed. All concrete is poured for west wall foundations, and men were kept on this work last night until 10 p. m. (signed) A. MacMillan."

Numerous letters, some being from the defendants to the plaintiff, some from the defendants to the architect, and some from the architect to the plaintiff, were offered in evidence, which, taken together and in conjunction with other evidence, help to show what transpired and what was the conduct of the parties in regard to the contract and property in question.

On December 18, 1916, the plaintiff advanced to the defendants, pursuant to the original memorandum of October 28, 1916, the sum of $18,000.00. On January 27, 1917, the plaintiff wrote to the architect stating that the Owners had not yet signed the plans and specifications, as provided for in the contract. Subsequent to that date, however, they were signed.

F. M. Stresenreuter testified that in a conversation, during the latter part of February, with the architect and his assistant, he told them that "they were making a great many changes on this building, and were greatly increasing the cost of it. That they wanted to know approximately what some of the changes would amount to," and "we figured it up as near as we could with the plans that we had on hand at that

time, and as far as the work was done.'' On or about February 6, 1917, the plaintiff furnished the architect and the defendants with the following list of extras, which were then claimed:

| | |
|---|---:|
| Pile foundation | $ 6,372.05 |
| (Except concrete on account change in foundation construction different than St. Clair building), no charge. | |
| Testing of soil | 258.75 |
| Survey | 15.00 |
| Extra reinforcing (rods in piers and ret. walls) | 1,830.00 |
| Reinforced concrete floors and drive and partition between 1st fl. and driveway | 1,441.00 |
| Foundation for stack | 150.00 |
| Vault | 1,550.00 |
| Extra account laminated constructions over B. room | 65.00 |
| Extra account laminated over driveway | 115.00 |
| Roof stirrups | 105.00 |
| 250 ft. sawtooth skylight | 2,150.00 |
| Difference between oak W. C. partition as specified and Y. P. | |
| Coal room | 1,460.00 |
| Shipping room walls and roof above 1st fl. | 385.00 |
| Revolving door | 865.00 |
| Ceiling mould. and boards | 1,061.00 |
| Difference between iron stairs and wood stairs | 4,071.00 |
| Difference between steel rail and wood rear stairs | 105.00 |
| Fire doors and windows at fire escape | 3,041.00 |
| Counter flashing main roof | 130.00 |
| Difference between double hung and pivoted windows | 910.00 |
| Polished wire glass instead of ordinary ribbed | 382.00 |
| 16 additional metal windows | 640.00 |
| Difference between Barrett Spec. roof and roof as specified for St. Clair Bldg. | 436.00 |
| Difference in plastering front stairway | 1,361.00 |

Difference between Rice's Mill White Paint
    and Cold Water Paint................    1,790.00
Awning not included in the above.......
Electrical work not included in above....

                                             $31,284.80
1 fire escape ...........................    1,231.00

                                             $32,515.80

Fred M. Bowes testified that he was present with
F. M. Stresenreuter at the office of the architect when
this list was discussed, and a large number of the
items were agreed to be omitted, although several
were allowed, at least, in part. The architect testified
that he was present, and that the list was gone over
by Fred M. Bowes, and that the latter stated which, if
any, of them he would not allow.

C. Stresenreuter, Superintendent of Construction
for the Contractor, testified that the building was
practically completed at the end of May, 1917; F. M.
Stresenreuter, that the building was completed in
June, 1917. There was evidence tending to show that
some work was done on the building, however, long
after the latter date.

The first payment received by the plaintiff was on
an architect's certificate dated January 25, 1917; the
architect's certificate was for $20,000.00. It contained
a statement showing the original contract to be
$183,000.00. In it the architect certifies "that the gen-
eral work in connection with the building has been
satisfactorily partly (fully) completed in compliance
with the terms of the contract, and that Stresenreuter
Bros. are entitled to a payment of $20,000.00." The
certificate also recites that whether issued as final
or otherwise, it "is an opinion only." It also shows
a receipt from S. W. Straus & Company for $20,000.00,
on the same date. On January 26, 1917, the plaintiff
signed a paper acknowledging receipt of $20,000.00,
and agreeing to complete the contract according to

the plans and specifications submitted to "S. W. Straus & Company, and as soon as the further sum of $163,000.00 was paid, to release and waive any lien against the building." The loan having been made through S. W. Straus & Company, the money that was paid to the plaintiff came from that firm as the work progressed and as architect's certificates were presented. At the time the plaintiff obtained the first $20,000.00, it furnished to S. W. Straus & Company a sworn statement of those who had been employed or contracted with from whom they had secured proposals for materials or labor, or both; also, of the respective amounts due or to become due each subcontractor. That statement amounted to $165,157. Altogether eight architect's certificates were offered in evidence, dated January 25, February 10 and 24; March 15 and 29; April 16; May 3 and 28, 1917. Each purported to show the balance due on a maximum basis of $183,000.

M. Stresenreuter, president of the plaintiff company, one Scown, general contractor, and one Meyne, a building contractor, testified to certain differences between the buildings, and Stresenreuter himself gave his opinion as to the difference in the cost, due to the building in question being different from the St. Clair building. His evidence describes a long series of substantial differences. He then gave an estimate of the extra cost of making the changes. It is as follows:

| | |
|---|---:|
| Driveway | $ 8,000.00 |
| Coal room | 4,000.00 |
| Areaway | 1,000.00 |
| Store fronts | 7,500.00 |
| Difference in elevators and stairways | 3,500.00 |
| Chimney or smokestack | 4,000.00 |
| Light shaft | 7,000.00 |
| Additional fire escape | 3,500.00 |
| Plastering | 7,000.00 |
| Increased price of face brick | 1,500.00 |
| Extra toilet equipment | 4,500.00 |
| Additional height of pent house and weight | 3,000.00 |

Difference in girder construction.......... 10,000.00
Change in location of toilet rooms and eleva-
    tor ............................... 10,000.00

                                      $74,500.00

On cross-examination he gave figures that aggregated $96,200.00.

There was offered in evidence on behalf of the plaintiff a list of invoices, and F. M. Stresenreuter testified that therein there was stated the reasonable value of the materials described. He also testified that the amounts paid to the subcontractors were the reasonable value of the work and materials furnished. The invoices and the subcontracts were offered in evidence over the objections of the defendants. Certain timesheets were offered in evidence, and a certain compilation was admitted by stipulation in lieu of using the original books.

On behalf of the defendants, Floto, an architect and engineer, and Cowing, a structural engineer, testified concerning the similarities and dissimilarities of the building in question and the St. Clair building. Floto stated that the building in question, in actual floor area, is 23% larger than the St. Clair building; that a change in the driveway would make an additional cost of $1,359, and that there were certain other differences in construction, owing to the changes made by a departure from the form of the St. Clair building, and which resulted in extra cost.

On behalf of the defendants, eleven reasons are urged to show that the judgment is erroneous. We shall consider them *seriatim.*

(1) It is contended that where a building contract requires architect's certificates as a condition precedent to payment, recovery cannot be had under the common counts unless the architect's certificate has been procured. An examination of the contract leads us to the conclusion that it did not require architect's certificates as a condition precedent to payment. The

physical form of the contract shows beyond peradventure that it was the intention of the parties that the printed Article III be superseded by the typewritten Article III. It is urged that the printed contents, although none of the blanks are filled out, are consistent with the typewritten attached sheet entitled Article III. With that view, we cannot agree. The typewritten provision is complete in itself. The typewritten Article III, which is pasted over the printed Article III, and covers the latter, in part, at least, is set out above.

As this was a cost-plus contract and the building was being erected by the defendants and it was provided that the architect's superintendent was to keep the time and check all the material bills, it would seem to be quite reasonable that there should be no provision for architect's certificates. Then, too, the provisions for payment in the printed form, as far as they may be understood, there being so many blanks, would seem to be inconsistent with the method of payment normally expected in the case of a cost-plus contract. We wish to put particular emphasis, however, on the fact that the physical condition of the contract is sufficient evidence to prove that it was not the intention of the parties that the printed Article III, with its blanks, should in any way be considered as part of their contract. None of the cases cited by counsel for the defendants contain a situation of fact like that in the instant case. It follows, therefore, that as the contract did not require architect's certificates as a condition precedent to payment, the question of consistency between the pleading and the evidence here contended for, does not arise.

(2) It is contended that under a building contract which requires architect's certificates as a condition precedent to payment, recovery cannot be had by the contractor unless he produces the architect's certificates, or pleads and proves a valid excuse for his failure to do so. As we have already stated that the

contract did not provide that architect's certificates should be obtained, it follows that this contention is untenable. As the contents of the typewritten Article III in the contract as entered into, does not provide for the issuance of architect's certificates, and the subject is not covered elsewhere in the contract, it was not error to hold that architect's certificates need not be produced as a condition precedent to the right to payment.

Under this point incident to the subject of architect's certificates, counsel for the defendants argue that the plaintiff failed to prove the allegations in the declaration as to the refusal of the defendants to arbitrate. In our judgment, however, there is nothing in the contract between the parties on the subject of arbitration that would be binding; and the allegations in the special count on that subject were mere surplusage; and, therefore, it was unnecessary for the plaintiff to prove them. The plaintiff set up *in hæc verba* in the declaration the written contract. Under those circumstances it became the duty of the court to determine its legal effect. As to the averments in the plaintiff's pleadings as to its legal effect, they would not be necessarily binding, as they are merely argumentative and, so, superfluous. *Francis Binz v. Tyler*, 79 Ill. 248. The refusal of the trial judge to give defendants' instruction numbered 22, which if given would have instructed the jury that if they found that the plaintiff did not procure his final architect's certificate that then the plaintiff could not recover, shows, in part, at least, that at the trial, the court considered typewritten Article III as a supersession of the printed Article III.

(3) It is contended that the contract was not a binding contract at the time it was signed, on the ground that the plans and specifications were not then in existence. Under this is argued whether or not there was a contract; if there were, what was the contract, and was any part of it waived; and was there an

alleged discrepancy between the declaration and the instructions.

Was there a contract? Applying the recognized principles of the law of contracts, it is difficult to escape the conclusion that the conduct of the parties, as evidenced by the two writings of October, 1916, created binding mutual contractual obligations. It is true that at that time the finished plans were not prepared; but the evidence shows that shortly afterwards the plaintiff was furnished a plan of excavation, and then later a revised plan of excavation, and that as a result, the plaintiff began the work of excavation; and, further, that from that time on, various other plans were furnished as the work progressed; that the plaintiff went on furnishing material and labor, with the knowledge and sanction of the defendants, until the building was practically completed; and that all that was done was, in a general way, at least, pursuant to the original Articles of Agreement.

What was the contract? It was in its inception supposedly expressed in the words of the writings. As time went on and the work progressed, was any provision in those writings waived or, in effect, altered? The latter gives rise to one of the chief controversies in the case. The plaintiff claims that the evidence proved that the provision for the maximum cost of $183,000.00, owing to the mutual conduct of the parties, was abrogated or waived. On that subject the evidence is voluminous, and to recite here even a comprehensible synopsis of it would be out of place. We have already stated, in a general way, that the original plan was changed and that various plans were furnished successively as the work progressed; that early in the history of the work, according to the testimony for the plaintiff, the defendants were informed that their plans "were making radical changes in the St. Clair Building, and that the figures on their building would far exceed the cost that the contract called for," and that although the defendants

knew the plaintiff's figures were not consistent with the fixed price of $183,000.00—and must be assumed therefore to have known that the plaintiff considered them in that light—they were in a number of instances sanctioned. Although the building was to be based on the St. Clair Building, and to cost not over $183,000.00, the evidence shows that after the written contract was executed, a very important and substantial change was made in the area and size of the building by carrying the west wall seventeen feet and seven inches farther west and providing for an enclosed driveway. Through numerous letters and conversations between the architect and the officers of the plaintiff, the parties were in almost constant communication. Many letters are in the record. Upon the subject of the waiver of the fixed amount, the jury had before it voluminous evidence. We have carefully considered it all and feel that it would by no means justify the conclusion that the determination of the jury was clearly against the weight of the evidence. Being a cost-plus contract, it, in a sense, as far as the owners were concerned, was capable of flexibility, provided they and the plaintiff were willing to modify the provision as to the maximum cost. And it is not surprising, having made such a contract, especially without having finished plans at the time, that their notion of just exactly what kind of a building they would actually build should change somewhat as the work progressed, and so, as a result, order things done and furnished that they knew were not originally contemplated. There was nothing sacred about the figures $183,000.00. The parties were entitled to abrogate and modify that as they saw fit, just as they might any other provision. It is fair to assume that the figures were precautionary and put in as a protection for the owners; and that protection they had the right, if they saw fit, and the plaintiff acceded, to forego. The jury found that they did, and from the record, as it is here, even without seeing

the witnesses, we are inclined to think they were right.

As a matter of law, acquiescence with knowledge of the facts, may imply assent and give rise to an obligation, or constitute a waiver of a right. In *De Bussche v. Alt.*, 8 Ch. Div. 286, at page 314, Thesiger, Ld. J. said: "If a person having a right, and seeing another person about to commit, or in the course of committing, an act infringing upon that right, stands by in such a manner as really to induce the person committing the act, and who might otherwise have abstained from it, to believe that he assents to its being committed, he cannot afterwards be heard to complain of the act." In Williston on Contracts, Sec. 679, it is stated that "acquiescence may form the basis of a true waiver, or it may not, according as change of position is made in reliance upon it." Further, "waiver may sometimes be implied from silence with knowledge of the facts." *Snead & Co. Iron Works v. The Merchants Loan & Trust Co.*, 225 Ill. 442.

Considering the law and the evidence, we are of the opinion that the jury were entitled to find that, although the contract originally contained the maximum cost price of $183,000.00, subsequently, as a result of the conduct of both parties, that figure as a maximum was waived.

As to the alleged inconsistency between the pleadings of the plaintiff and the instructions numbered 15 and 16, it is sufficient to say that the instructions as a whole, taken collectively, were entirely proper, considering the pleadings and the evidence offered at the trial.

It is also urged that the contents of various receipts given by the plaintiff from time to time and which recited "Contract price—cost plus 10%, not to exceed $183,000.00," were evidence of an estoppel. They, at best, were merely formal papers given for money admittedly due. Some evidence they were but

we are unable to conclude that they were sufficient to overcome the other evidence, which was the other way.

(4)   It is contended that the plans and specifications were accepted by the plaintiff as in accordance with the contract, and that the plaintiff led the owner to believe that they were accepted by him as being in accordance with the contract, and as the owner relied upon the plaintiff so accepting them as in accordance with the contract, and so permitted the plaintiff to proceed with the work, it is now estopped from claiming that the plans and specifications are not in accordance with the contract.   The evidence does not show, however, that the plaintiff, by words or conduct, led the owner to believe that the plans and specifications were accepted by him as being in entire accordance with the contract.   The evidence shows that conferences took place in October and November, sometime after the contract was actually signed, and that then the plan of the building, even its area, was in doubt.   Even after the conference in November, the plan of excavation for a seventeen foot and seven inch alley was furnished by the architect, and after that the architect issued plans and specifications covering the whole building, and some of those were changed as late as April 12, 1917.   It is our judgment that the evidence shows that the jury were fully justified in determining that all the parties knew that the plans and specifications were being changed from time to time, and, as finally completed and delivered, were different from what was contemplated at the time of making the original contract, and, further, were looked upon not as wholly consistent with the original contract as to what was then conceived as the plan of the building, but as creating, in some measure, a different situation.

The testimony of F. M. Stresenreuter, as we have already stated, was to the effect that he told the defendants early in the proceedings that they were mak-

ing radical changes in the St. Clair building, and that "the figures on their building would far exceed the cost the contract called for" and "they must expect the additional cost to go with it." The evidence, taken all together, very strongly suggests that, although the contract provided that the building was to be based on the St. Clair building, the building that was finally put up was the result in detail of many changes in the conception of the defendants as to just what they wished as to the building to be built. The only reasonable inference from the testimony of F. M. Stresenreuter and the other pertinent evidence would seem to be that the defendants were directly informed that the $183,000.00 outside limit of cost was abandoned. It follows, therefore, that the defendants were not deceived or misled, inasmuch as they knew what was taking place, and were actually taking part in the negotiations regarding changes, and the necessary extra material and labor.

Architect Crowen testified that the probable dimensions of the building were "changed when they changed from the alley theory to the driveway theory," and when asked whether the excavation was made in accordance with the plan of November 21st, he answered that the excavation in its finality went finally to the west line, and that "the basement wall was, in fact, moved over the same as the excavation." Apparently, from the testimony of the architect, when the contract was signed, the actual plan of the building was still in doubt. He testified, "We realized the time was short to complete this building, and action had to be taken. That is why I called this meeting between the parties in interest to determine on a certain plan of the kind of building that we were to build." There seems to be no doubt, therefore, considering what the original contract called for, that substantial changes and variations in the construction of the building were made after the contract was signed. In our judgment there is no sufficient ground

for claiming that plans and specifications, at any time, were accepted by the contractor as being in accordance with all the terms of the original contract.

Nor do we think the situation was changed because the plaintiff, on January 27, 1917, wrote the architect stating that the owners had not yet signed the plans and specifications as provided in the contract, which plans and specifications were, according to the testimony, subsequently signed. Those plans do not appear in evidence.

It is urged for the defendants that as the plaintiff made a claim for extras, after the general plans were approved, it, impliedly, informed them that there was a guaranteed maximum of cost.

In the brief for the defendants occurs the following: "Whether these alleged extras were proper extras, or not, makes no difference, and whether proper or not must be determined in accordance with the contract, but if at that time the plaintiff had construed the contract and all of the acts of the parties as constituting a waiver of the up-set price, $183,000, he would not have claimed extras—at most, he would have notified the owner that the cost had now exceeded the up-set price, and that under his understanding of the contract, he was entitled to disregard the up-set price, and was not bound by it." But as this was a cost-plus contract and the defendants, by its original terms, were to pay for all materials and labor and 10% additional—up to $183,000.00—it is only natural that, if changes were made that required more or different materials and labor than originally planned for, the plaintiff should itemize them and label them as extras without saying in express words that the figures in the contract had been waived and that the items in question were, therefore, a constituent part of the original cost.

The bill of complaint, which became a bill of particulars when the cause was transferred to the law side of the court, was on the theory that by delay

in furnishing plans and specifications and the extent to which the building erected differed from the contract-building and a building similar to the St. Clair building, the plaintiff is entitled to recover the total cost of the building plus a profit of ten per centum. It does not mention waiver expressly, but that is necessarily implied.

The additional count to the declaration set up, "that said requests and demands of the defendants to the plaintiff made for the additions, changes and modifications of said contract and the modifications so made thereof, were productive of great and increased cost, that the same exceeded the sum in said contract originally provided, * * * and in consideration that the plaintiff would modify, change and alter its said contract and perform such additional services, and secure the additional materials, and comply with the requests of the defendants in that behalf made to the plaintiff, and by the delay and interference of the defendants with the work of the plaintiff, failure to furnish specifications, drawings and detail drawings, and thereby increasing the cost of the said structure, and by causing and demanding, and requesting of the plaintiff to prepare a certain structure or building, variant from and dissimilar from St. Clair building, thereby the said defendants did waive the guaranty in said contract contained respecting the outside limit cost of the said building."

Instruction numbered 11, given for the defendants, is quite similar in effect to instruction numbered 15, given for the plaintiff. In 11, the jury is told it may add to the $183,000.00 the established cost of any changes and additions directed by the defendants. In 15, the jury is told that if the evidence shows that, notwithstanding the contract, the defendants directed the construction of a materially different building, entailing substantially increased cost, the measure for such construction would be the reasonable value ac-

cording to the rule in the contract, and the defend-
ants would not be entitled to apply the $183,000.00
provision.  Both are sufficiently consistent with the
bill of complaint, as a bill of particulars, and the
special count and the evidence.

(5)  It is contended that the admission in evidence
of the time and pay sheets, bills and invoices, and
copies of the books, was error.

As to the time and pay sheets:—It does not seem
seriously to be claimed that the money which the
plaintiff says is spent for material and labor, was
not actually spent on the building.  Further, the con-
tract contained the following:  "The architect's
superintendent will keep the time and will check all
material bills on this work."  Also, "It is further
agreed that all material purchased for this work shall
be by and with the consent of the owner's agent, and
triplicate bills furnished, one each for owner, archi-
tect and contractor."  It was, therefore, the right and,
apparently, the duty of the defendants themselves to
keep the time and check the material bills.  Whether
the architect's superintendent did keep the time and
check all material bills on the job is not shown, but
it is shown that sometime after the work was done,
an auditor of the defendants checked over the pay
rolls at the plaintiff's place of business.

The evidence shows that one Mitchell was the plain-
tiff's timekeeper.  He testified that when the work
began, he started working for the plaintiff as time-
keeper and remained as such until the work was done;
that he kept the time in small "complimentary books"
that were given out by the Illinois Brick Company;
that the books were taken to the office, and the
amounts transferred onto the time sheets.  When
asked, "You have seen these time sheets we have
here, haven't you?" he answered, "Yes, sir."  When
asked, "Were those the sheets it was transferred
onto?" he answered, "Yes, sir."  He further testi-
fied that after the time was transferred to the time

sheets for the purpose, the books were either destroyed or taken to a small job, and that he does not know what became of them, but that they were not preserved. He further testified that his timekeeping meant checking the men as they came in in the morning and seeing that the men returned to the job after the lunch hour; that he had to go all over the building to see that the various men were really doing the work, so that if he "checked the men for eight hours, they were doing eight hours' work." It is urged for the defendants that nowhere in Mitchell's testimony did he state that he kept such time books correctly and accurately, or that the information contained in his time books was a true and correct record of the things by him therein recorded. We cannot agree with that contention, as it would seem that the normal, reasonable inference to be drawn from Mitchell's testimony is that he kept the time books correctly, and that the latter contained a true record of the time of the men.

C. Stresenreuter testified that he saw the men at work on the job from day to day. He, also, testified, when shown the time and pay sheets, that they were made by him from the time books of the defendants' building. When asked if he made the entries from the time books, he answered, "From the time books on the job kept by the timekeeper and the material clerk"; that he made the entries on the time sheets every Thursday evening for the preceding week; that he knew the men that were on the job and on the pay roll, and saw them from day to day, so as to know in a general way "the correctness of the time books as to the men being employed there"; that entries in the time books according to his observation were correct. When asked if he made the entries on the time sheets, which were shown him, correctly from the information he received from the timekeeper, he answered, "Absolutely." He further testified that the plaintiff paid the men their wages from those

time books and pay sheets—that is the amount of their checks or cash; "that that was paid according to these computations here." There being no contradictory evidence, it is our judgment that the time and pay sheets were properly admitted. Counsel for the defendants cite a number of cases on the subject, but in none of them were the facts quite like those here. In view of the fact that there is no contradictory testimony, it would certainly be hypercritical to hold that the evidence of Mitchell and C. Stresenreuter did not sufficiently establish the right to introduce the time and pay sheets.

In *Kent v. Garvin,* 1 Gray (67 Mass.) 148, the court said:

"It has long been the settled law of this commonwealth, that it is not a valid objection to the competency of a party's book (here the time sheets), supported by his suppletory oath, that the entries therein were transcribed from a slate or memorandum-book in which they were first entered for a temporary purpose, although the entries on the slate or memorandum were made by a person other than the party who copied them on to the book. In such cases, the entry of the charges in the regular day-book of the party is deemed to be the first and original entry, and as such, competent proof, with the oath of the party, of the charges therein made."

As to the admissibility of the bills and invoices:— It is stated in the defendants' reply brief that "the only fact disclosed by this testimony is that the materials were delivered to the building." The words "this testimony" refer to the testimony of Mitchell and C. Stresenreuter. An examination of that testimony, however, leads us to the conclusion that it not only proved that the material was "delivered to the building," but that it was used in the building. Mitchell testified that he got the tickets from people who brought the material to the building; that he checked "all the materials that came into the job from all these different people," and in the evening

turned the tickets over to C. Stresenreuter, who took them down to the office; that he, the witness, kept a true and correct record of the materials; that when he turned in the tickets they were right as to quantity. The bookkeeper of the plaintiff testified that he kept the general books; that he became familiar in the course of his duties with the work done on the building in question; that he got the tickets which were brought into the office by C. Stresenreuter "relating to materials and articles coming onto the work"; that the tickets were sometimes brought in their pockets, and sometimes sent in in envelopes; that they were made out by the people from whom the material was gotten; that Mitchell, who was present on the job, had the job of taking or checking those tickets; that they were immediately brought in by C. Stresenreuter; that from time to time he received invoices or bills from persons who did furnish, or claimed to have furnished, materials and supplies to the building in question; that when he received such invoices or bills, and also the tickets, he checked the invoice with the ticket, and destroyed the latter; that the check of the ticket against the invoice was for the quantity; that when he finished the checking of the tickets against the invoices he then made charges in the books for the amounts in dollars and cents, and the persons to whom such amounts were paid; that the cash books showed the payments to the various persons. When asked, "Did you correctly enter on the books the price as indicated by the invoice and as checked by him against those invoices as they came in in their regular course of business?" he answered, "Yes, sir" and, further, that he made a true and correct entry of the amounts paid to various people for material. When asked, how he knew the materials went into the building in question, he answered, "Well, the confidence I had in the man who was receiving the material. When he sent in the tickets I concluded the material was for that building"; that

usually the invoice specified the quantity of delivery. He further testified that the invoices as received by him corresponded with the tickets in regard to quantities, and that he checked them to discover that fact before making the entries in the books; that he got his information as to price either from the contract or agreement, or from Mr. Stresenreuter, but in most cases from the written contracts for materials, most of which contracts were available for his examination; that where there was no contract, he got the information from F. Stresenreuter; that he entered correctly in the books, in the regular course of business, the price of the material as it was specified in the contracts, or at the rates given him by F. Stresenreuter.

Inasmuch as it is practically admitted by the defendants that the materials were delivered to the building, we think the evidence is ample to show that it was not only delivered to the building, but used in the building.

We are of the opinion that no error was committed by admitting in evidence the bills and invoices.

As to the admission of copies of the books:—It was stipulated at the trial that certain sheets containing summarized totals of a multitude of items in books of the plaintiff, and which were copied from the books of the plaintiff, might be used instead of the books themselves; that no objection would be made that they were copies. In the course of a colloquy between the counsel and the court as to the stipulation, plaintiff's counsel asked, "May these sheets be considered in evidence then?" to which the defendants' counsel answered, "Yes, except as to the materiality of the books." And, further, "That is, the same objection to these sheets as we would make to the books; but no objection on the ground that they are copies."

It was the contention for the defendants that there was no evidence that the prices that were given to

the bookkeeper by F. Stresenreuter were the prices paid for the materials covered by the invoices, or that F. Stresenreuter, or any one else, testified that the prices contained in the contracts from which the bookkeeper obtained part of his information were true and correct.

The bookkeeper testified as to the invoices, that the amounts therein shown were the amounts actually paid to the material men. In other words, the evidence shows, without contradiction, that these payments were made. That evidence, where there is none to the contrary, supplants the necessity of express testimony that the prices were "true and correct." The bookkeeper testified that when he had finished checking the tickets against the invoices, he made charges in dollars and cents in· the books for the amounts, and would "make a record in" his "book to whom such dollars and cents went"; that he made a correct entry of the amounts paid to various people against the invoices. He further testified that he got his information as to the correctness of the charges from the contracts chiefly, and from F. Stresenreuter; that they had written contracts for materials in most cases; that he correctly made the entries in the books of account, which were kept in the regular course of business. The books themselves were produced, and the bookkeeper testified that they showed correctly and truly the amounts paid. In our judgment, the evidence justified the admissibility of the copies of the books. Further, another reason why it was not error to admit them is the fact that the record does not show that in the course of the trial the objection which is now contended for was made.

(6) It is contended on behalf of the defendants that the trial judge erred in giving to the jury instruction number 10. That instruction was originally presented by counsel for the defendants, and then modified by the court, and as so modified, given. The instruction as originally prepared undertook to tell

the jury if they found that the plaintiff "did not sub-
stantially complete the erection of said building with-
in the time limited in said contract, then and in such
event the defendants are entitled to damages at the
rate of fifty ($50.00) for every day, excluding Sundays
and holidays, that such work was not completed from
and after April 1, 1917." The trial judge added to
the foregoing, the following: "unless the jury believes
from the evidence that such delay, if there was such,
or some part of it, was occasioned by the act, omis-
sion or neglect of the defendants, or either of them,
or that the defendants waived such provisions of the
contract." Article II of the contract contains the
following: "The contractor agrees to complete the
work by and at the time or times hereinafter stated,
to-wit: On or before April 1, 1917; and to pay or
allow the owner as liquidated damages the sum of
fifty dollars ($50.00) for each day thereafter, Sun-
days and legal holidays not included, that the work
remains uncompleted." The evidence shows that the
work was not completed by April 1, 1917, and just
when it was completed was a matter for the jury
upon the evidence. There was considerable evidence,
however, tending to show that the plaintiff was de-
layed in its work by reason of the failure of the de-
fendants to furnish plans, and by ordering radical
changes in the construction of the building. That
being the case, it would seem to be entirely proper
for the trial judge to instruct the jury as he did. If
delay in the construction of a building is caused by
the conduct of the owner, he is not entitled to place
the blame on the builder, even though there is a pro-
vision in the building contract that the work shall be
completed by a given time. In *Harrison v. Trickett,*
57 Ill. App. 515, where there was a provision in a
building contract that the building should be finished
by a given time, or the contractor should pay a forfeit
of $50.00 per day for any day over that time which
was required to finish it, and the builder failed to

complete it by the day specified, owing to the fact that the owner had ordered some extra work, the court said, in considering an instruction given to the jury on behalf of the plaintiff: "The mere ordering of extra work which it would not take more than a day to do, would not absolve a builder from the consequences of a delay of six weeks in completing work he had undertaken. For such delay as was reasonable, that is, for such time as was reasonably required in which to do the extra work, and such delay as on account thereof was caused, appellee was, by the extra work, excused." Citing Emden on Building Leases and Contracts, 167; *Thomhill v. Neats*, 8 Common Bench, New Series, 831; *Jones v. St. Johns College*, Law Rep. Ch. Queen's Bench, 115; *Oakden v. Pike*, 34 Law Journal Chy. 620; *Holner v. Guppy*, 3 Meeson & Welsby, 387.

(7) It is contended on behalf of the defendants that the plaintiff is not entitled to 10% on the amount of subcontracts, but only 10% on the cost, of the material and labor, to the subcontractors. The language of Article III is as follows: "Contractor shall furnish all labor and material necessary to perform his work under this contract at cost plus 10%. The established cost will include all labor and material purchased, plus a profit of 10%, and the cost of scaffold lumber, freight and drayage, liability insurance, workmen's compensation insurance, and contractor's Employers Ass'n fees, which items are to be added after the cost of labor and material plus a profit of 10% has been arrived at. It is understood that the contractor shall furnish his own overhead, such as bookkeeping and accounting and office management, machinery and tools." We think the intention of those words, taken in conjunction with the evidence, was that the plaintiff would be entitled to 10% on the amounts charged by the subcontractors. The situation in *Grafton Hotel Co. v. Walsh*, 228 Fed. 5, and *Bushnell v. Brand*, 199 Ill. App. 542, was quite differ-

ent from that in the instant case.  In the *Bushnell* case, the contract provided that the contractor was to receive a sum equal to the actual cost of the material and labor, plus an arbitrary sum of 15%.  The court in that case, said: "Such compensation was to be a sum equal to fifteen per cent of the actual cost of material and labor furnished by plaintiffs to defendant.  The words 'actual cost' have a fixed and definite meaning, and in the instant case should be construed to include only the actual price paid for labor and material, and not the subcontractor's price. * * * What was the actual cost does not appear from the evidence."  That decision was evidently based on the presence and use of the adjective "actual" and it is very doubtful if in that case the court would have restricted the compensation under the original contract, even though it was a remodeling job, to a percentage of what the subcontractor had actually paid out were it not for the use of the word "actual."  Here the parties evidently contemplated the letting of subcontracts.  Counsel for the defendants, in their brief, use the following language: "Of course the parties contemplated subcontracts—that is clear from the reading of the contract, but that is not the question.  Did they contemplate paying 10% of the amount of the subcontracts?"  And when the architect was asked, "Now, these different subcontracts made on this building for sprinkler system, and for elevators, and for electrical wiring, and these various subcontracts that were made; you knew of the making of those subcontracts at the time they were made, didn't you?" he answered, "Yes, sir." He further testified that some of the subcontracts were made in his office subject to one of the Stresenreuters putting his name on them; that he and the defendants worked "in conjunction with one another on these various subcontracts."  And, further, when the architect was asked as to whether the plaintiff "was doing or going to do all the work and labor of

his own, such as building elevators and things of that kind," and answered, "No," counsel for the defendants objected, and stated, "He has always testified that they took subcontracts and he knew about it. We have never denied that he did." Also, correspondence between the parties shows that many directions were given by the architect to the contractor in regard to subcontracts, from which it is apparent that the architect was interpreting the contract to the effect that he, the architect, was acting for the owner.

In the affidavit of merits of one of the defendants, it is denied that "the bids of subcontractors were submitted and approved by these defendants, and that if approved by said architect, same was not on behalf of said defendants." That undertook to make an issue of whether the bids of the subcontractors were submitted and approved by the defendants; but it did not undertake to question in any way the plaintiff's present construction of the contract.

Counsel for the defendant criticise the giving of instruction number 12, as modified by the court, and state that that instruction in its original form was unobjectionable. It undertook to tell the jury that the plaintiff was not entitled "to recover 10% on the amount of any subcontract made by the plaintiff with the other persons for the performance by such other persons of any part of the work that the contractor had agreed to perform." In that form it was misleading, because it is conceded by the defendants that the contractor was entitled, if at all, to 10 per cent on the actual cost of the labor and material furnished under the subcontracts. Further, when the court modified it by adding the words, "except as to such subcontracts shown by the evidence to have been approved by the architect named in the contract," it became too narrow. In any event, it was more favorable to the defendants than the plaintiff, and in no way constituted a substantial error.

Considering the terms of the contract and the con-

duct of the parties, it is our judgment that the plaintiff was entitled to 10% of the amount of the subcontracts.

(8)  It is contended for the defendants that as the contract of October 28 provided for the erection of a building in accordance with plans and specifications to be prepared by an architect, and in accordance with city ordinances, the failure to introduce the city ordinances in evidence so that the court and jury might determine whether or not the plans and specifications as prepared complied with the contract, prevented the contractor from recovering on a *quantum meruit* based on the claim that the plans and specifications were not in accordance with the contract.

In the first place, as the subject-matter of this contention is not based upon anything which was urged at the trial, and as it is the law that if an objection is of such a character that it might have been removed by further evidence and is not made and insisted upon in the trial of the case, it will not be considered here.

In the second place, considering the testimony of the architect that the plaintiff had secured a permit for the building, and that he, the architect, furnished a set of plans that were taken to the City Hall and marked approved by the city, there is no evidence that the building as finally constructed was not in accordance with the city ordinances, and it is only fair to assume that the building was constructed as provided for in the contract, as far as the requirements of the city ordinances are concerned.

In the third place, the argument of counsel for the defendants that it was necessary for the plaintiff to introduce the city ordinances in order to show what they required as distinguished from what the plans and specifications required, is not persuasive.  The latter point, however, counsel for the defendants in their reply brief seem to waive, as they therein state, ''The point is that it was not proved that the building was erected in accordance with the city ordi-

nances.'' That argument is answered by what we have said above.

(9) It is contended on behalf of the defendants that under any theory of the case the verdict was excessive "because there was no evidence at all that the reasonable value of the work and materials exceeded $27,912.00.'' The bookkeeper for the plaintiff testified that certain sheets which were offered in evidence and received by stipulation instead of the books, contained entries showing "the amounts expended from time to time on behalf of this Bowes Building job,'' and "the amounts received and credited against the account''; that the gross debit was $206,379.58, against which there should be allowed a credit of $3,961.24, leaving a debit of $202,418.34.

In the brief of counsel for the defendants, a compilation is made of the invoices, time sheets, etc., as follows:

| | |
|---|---:|
| The invoices aggregated (after a number of corrections had been made therein on the trial, plaintiff's attention having been called to errors requiring corrections) | $ 73,396.47 |
| The time sheets covering labor (including also employer's liability insurance amounting to $1,390.70) | 34,178.52 |
| Sub-contracts | 75,599.04 |
| Sundry other items | 2,912.30 |
| Charles Stresenreuter (vice-president) salary | 2,517.50 |
| Note given for cash advanced to defendants by plaintiff | 18,000.00 |
| | $206,603.83 |
| From this aggregate of $206,603.83 there were deducted as credits to which the defendant was entitled, and for which they never received credit until at the close of the plaintiff's testimony | $ 3,691.24 |
| | ⸱$202,912.59 |

Cash payments admitted.................. 175,000.00

                                          $27,912.59

It will be observed that in the foregoing account no allowance is made for the 10% of cost. The bookkeeper testified that deducting from the gross debit of $202,418, *supra,* the sum of $20,198.60 for scaffold timber, cartage, liability insurance, building construction, Employers' Ass'n and cash advanced, there was left a balance of $182,219.74, on which he computed 10%, being $18,221.97; that he then added the latter amount to the former debit of $202,418.34, together with interest on the note, in the sum of $2,642.00, making a gross total of $223,282.31; that he deducted from that amount $175,000, which had been paid on account, leaving a present balance of $48,282.31. It will thus be seen that if 10%, according to the bookkeeper's computation, and being $18,221.97, is added to the tentative figures in the account of defendants of $27,912.59, the total is $48,776.54, whereas, the total, according to the plaintiff's bookkeeper's account is $48,282.31. The verdict of the jury was for $35,000.00. Considering the evidence and the view we take of the case, we feel bound to conclude that the verdict was not excessive.

(10) It is contended on behalf of the defendants that certain hypothetical questions propounded to contractors on behalf of the plaintiff were improper, and that they did not contain important, undisputed and material facts, and were so framed that they did not assume facts, but stated assumptions as actual facts. The first question objected to, in its essence, asked the witness whether in his opinion as a contractor, where a building originally designed to be on a basis similar to the St. Clair building, except that the ground area would be larger, that more glass was to be used, and it was to be seven stories instead of six, and after undertaking to build such a building, it was subsequently changed in many ways (reciting

many changes), the added cost could be determined with reasonable certainty? An analysis of the actual question shows that it was not in good form, and that it could not be easily understood. We do not consider the question, however, as of any special import, for whether the jury understood it, or failed to do so, it could not have any especial bearing on their verdict. Whether or not the difference in the cost of the building as originally conceived and as subsequently built, with many changes, would be ascertained with any certainty, was an academic question, of no special import. The contract, here, was a cost-plus contract, and the plaintiff put in evidence undertaking to show the total cost, so that the difficulty of making such a computation as counsel had the witness testify to, by means of a hypothetical question, was entirely immaterial.

The second hypothetical question objected to was propounded to one Scown, general contractor. That question after reciting certain facts, asked "whether the building with these elements contained in it which I mention, would as so built, be more or less costly than a building similar to the St. Clair building, excepting for those elements?" That question, also, was immaterial, and the answer to it not helpful nor hurtful. But, even if the two questions were considered pertinent, and the subject-matter material, we do not think it was error to permit them. In *Shaughnessy v. Holt*, 236 Ill. 485, the court said, "The proper practice is to state hypothetically the case which the attorney thinks has been proved and ask a question based upon such hypothetical case." Citing *Elgin, Aurora and Southern Traction Co. v. Wilson*, 217 Ill. 47. In *City of Aledo v. Honeyman*, 208 Ill. 415, the court said, "The rule applicable to hypothetical questions is, that the party seeking the opinion of an expert may, within reasonable limits, put his hypothetical case as he claims it has been proven and take the opinion of the witness thereon, leaving the

jury to determine whether the case, as put, is the one proven.'' In *Catlin v. Traders Ins. Co.*, 83 Ill. App. 40, the court said that counsel ''is not obliged to accept the theories of the opposite party as to what the evidence tends to prove.'' Citing Rogers on Expert Testimony, Sec. 27; see also *Economy Light & Power Co. v. Sheridan*, 200 Ill. 439; *Grand Lodge I. O. M. A. v. Wieting*, 168 Ill. 408. ''The questioner is entitled to the witness's opinion on any combination of facts that he may choose.'' Wigmore on Evidence, Sec. 662. That is perhaps too broad. But it is, apparently, only necessary, considering the particular issue, that a hypothetical question shall contain such a collocation of the facts as the questioner assumes the evidence tends to prove, and the trial judge, in his discretion, may consider pertinent and, if answered, probably helpful. As to the form of such a question, it is only necessary that it be substantially hypothetical. The rules of evidence are not finical as to form. It is sufficient if the question is, in substance, propounded as a hypothesis. Wigmore on Evidence (*supra*).

(11) It is contended that the trial judge erred in refusing to give certain instructions proffered for the defendants. Instruction 19 told the jury that the plaintiff was not entitled to ten per cent on the amount of any subcontracts, nor on the cost of scaffold lumber, freight and drayage, liability insurance, certain insurance and association fees. That was properly refused. All the defendants were entitled to on that subject was given in their instruction 12, as it was modified by the court. Defendants' instruction 20, which was refused, was based on the theory that the contract, together with the acceptance of the plans and specifications, constituted an estoppel. It is not essentially different from defendants' instruction 8, which was given. Defendants' instruction 21, which was refused, was substantially the same as number 7, which was given, save that it did not contain the

waiver qualification. Without that, it was inapt, and with it, it would have been superfluous. There is nothing in *Fitzgerald v. Neville,* 210 Ill. App. 659, and *Erikson v. Ward,* 266 Ill. 259, to the contrary. Defendants' instruction 23, which was refused, contained the substance of instruction 8, but added, if the jury found that the final plans "did not require the undoing of the work performed by the plaintiff in accordance with the preliminary plans." The evidence did not justify that instruction. Plaintiff's claim, properly, was not limited to "undoing," but to increasing the amount of material and labor. The instruction does not rest upon any hypothesis sustained by the evidence.

The defendants' instruction 24, which was refused, undertook to tell the jury that if changes were made —it does not state whether great or small—and the parties were silent as to cost, then there could be no recovery but within the fixed provision of the contract. That, we think, was properly refused. It is easily conceivable that the conduct of parties may bring about a waiver of one or more of the terms of a contract without there being any agreement to that effect in express words.

Counsel for the defendants cite the *County of Cook v. Harms,* 108 Ill. 151. In that case, Harms, on October 6, 1875, entered into a contract with Cook county to build the foundation of a new court house in Chicago, according to the plans and specifications of an architect. Harms began work under the contract, and went on with it until January 17, 1876, when the county board rescinded its action in accordance with which the original contract had been made, and approved and adopted new plans. Harms then furnished materials and work for the foundation in conformity with the plans last approved and adopted by the county. Suit was brought by Harms for the value of the materials and work and labor furnished by him, and obtained a judgment. The instruction given on

behalf of the plaintiff and objected to for the defendant, was substantially as follows:—"'If the jury believe, from the evidence, that the new plans for a foundation * * * were so different from the old plans as to provide for a new and materially different job * * *, and not a mere change * * *, and that such adoption of the plans was without the consent of plaintiff, then the original contract was no longer binding upon the plaintiff, and he would be entitled to be paid according to measurement and value for such work and materials, if any, as the evidence shows was furnished to defendant and accepted by said board of commissioners, with full knowledge on their part,—if the jury so find, from the evidence, that the same was furnished upon an implied contract to pay for the same, and not under the contract read in evidence.'" In passing upon that instruction, Mr. Justice Scholfield said: "The contract was made pursuant to bids or proposals previously invited by published notices, and those bids were made upon calculations based upon the plans and specifications annexed to the contract. We are not authorized to assume the furnishing of these plans and specifications, and the inviting of these bids or proposals, were intended either to entrap the unwary or as an idle and useless ceremony; but we must, on the contrary, assume they were intended in good faith, for the purpose of intelligently and *bona fide* making a contract for the construction of the foundation of the court house. If intended for that purpose, the work to be done would have to conform, in all material respects, to that described in the plans and specifications; and if materially variant therefrom, it would necessarily be a new and different work, because not within the contemplation of the parties when the contract was made."

In our judgment no substantial error was made in the giving and refusing of instructions.

In conclusion, after carefully considering the whole

situation as exhibited by the record, we feel bound to conclude that the judgment should be affirmed.

*Affirmed.*

O'CONNOR, J. and THOMSON, J. concur.